IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VERNITA GRAY and PATRICIA EWERT, </br></br>      Plaintiffs, </br></br> LISA MADIGAN, Attorney General of the State of Illinois, </br></br>      Intervenor, </br></br> v. </br></br> DAVID ORR, in his official capacity as COOK COUNTY CLERK, </br></br>      Defendant. | Case No. 13-cv-8449 </br></br> Honorable Thomas M. Durkin </br></br> Magistrate Judge Jeffrey T. Gilbert |

# ILLINOIS ATTORNEY GENERAL'S MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

LISA MADIGAN
Attorney General of Illinois

Richard Huszagh
Malini Rao
Christopher Kim
Assistant Attorneys General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3000

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case comes before the Court in unusual and compelling circumstances, where the unique rights and incalculable benefits of being joined in marriage that Plaintiffs have greatly hoped for and anticipated for years are simultaneously made closer by the recent amendment of the Illinois Marriage and Dissolution of Marriage Act, 750 ILCS § 5/101, *et seq.* (the "Illinois Marriage Act," or "Act") permitting marriage for same-sex couples, and also effectively put beyond Plaintiffs' reach by the terminal illness of plaintiff Vernita Gray ("Vernita"), which almost certainly will prevent her from living until the new law is scheduled to take effect on June 1, 2014. The risk of irreparable injury to Plaintiffs and the absence of any adequate remedy at law for them are indisputable. Their likelihood of success in challenging the constitutionality of Illinois' continuing prohibition against same-sex marriages, as applied to them, is considerable.

The focus of Plaintiffs' equal protection claim, which the Attorney General has joined, is the discrimination under Illinois' current law based on the sexual orientation of persons who wish to marry. The Attorney General submits that such discrimination is subject to heightened scrutiny under the Equal Protection Clause. But the court need not decide that issue for purposes of Plaintiffs' motion because even under the enhanced rational basis standard articulated by the Supreme Court in similar situations, the discrimination under current Illinois law cannot validly apply to Plaintiffs. An intent to single out an unfavorable political group, like gays and lesbians, for disfavored treatment establishes the absence of a legitimate government interest sufficient to sustain such review. And the history of Illinois' ban on same-sex marriage shows such an intent.

Even if it were appropriate to look at alternative, hypothetical justifications for that ban, they fail to sustain it in this case. The common justifications for limiting marriage to opposite-sex couples — including promoting "responsible" procreation and child-rearing by committed, biological parents — were already greatly undermined by the 2011 amendment to the Illinois Marriage Act allowing same-sex couples to enter into "civil unions," with all of the rights and privileges granted to opposite-sex couples under Illinois law *except* the socially preferred designation of "marriage." Those justifications are further eroded, to the point of having lost virtually any claim to legitimacy, where the ostensible public policy justification for them has now been expressly disavowed by the Illinois legislature. A legislative judgment as to when a change in policy should take effect is entitled to substantial judicial deference, but that deference is outweighed here by the urgent circumstances presented in this case.

Finally, in light of Vernita's terminal illness and the Illinois General Assembly's historic decision to put same-sex couples on equal footing with opposite-sex couples concerning the institution of marriage, the balance of hardships tips heavily in favor of granting the temporary injunctive relief sought by Plaintiffs. And such relief for Plaintiffs, whose situation is unique, does not disserve the public interest.

## FACTUAL BACKGROUND

**History of Illinois Marriage Law**

For decades, the law in Illinois, as in many States, did not recognize the possibility of a marriage between two men or two women. When the Illinois Marriage Act was adopted in 1977, the bill's sponsor confirmed that it could not be "considered a Gay Bill"

under which the General Assembly "would be, in fact, supporting that type of . . . accepting that kind of marriages to exist." 80th Ill. Gen. Assem., Senate, Transcript of May 19, 1977 at 286-87.

In the mid-1990's, when it appeared that the Hawaii Supreme Court might declare unconstitutional that State's prohibition against same-sex marriages, Illinois, along with many other States, responded to the concern that its own prohibition against such marriages might not protect it against the obligation to recognize such a marriage legally entered into in another State. The result was an amendment to the Illinois Marriage Act, passed with overwhelming support in both chambers of the General Assembly, specifically declaring same-sex marriages to be against Illinois public policy. See Public Act 89–459. Senator Sieben, speaking in support of the bill, declared that "no civilization has ever survived by accepting homosexual marriages . . . , yet that is what homosexual members of society are asking of us." *Id.* at 97. Senator Petka, stating that he strongly supported the bill, commented that he had seen leaders of the recent "infamous homosexual march in Washington, D.C." who continued to insist on the "right to have a marriage [and] to have the same benefits that have been traditionally enjoyed by heterosexual couples." *Id.* at 100-01. In opposition to the bill, Representative Schakowsky read a letter signed by clergy from multiple faiths and denominations declaring that "[t]he real and immediate impact of [Senate Bill] 1773 is to foster a climate of intolerance and hatred against lesbian and gay people." 89th Ill. Gen. Assem., House, Transcript of April 25, 1996, at 58. She continued:

> We spend a lot of time here talking about family values. And today we are aiming a piece of Legislation at people who's [sic]

3

> only crime . . . is that they want to create a family. They want to make a long-term commitment to one another. They want to take responsibility for each other in sickness or in health. They want to declare openly and with the sanction of our society, their love for each other. . . . I urge a "no" vote.

*Id.* at 59.

As public attitudes toward gay and lesbian members of society changed, the Illinois legislature took steps to prevent discrimination against them in employment, housing, and other areas. And in 2011, the General Assembly authorized "civil unions" for gay and lesbian partners, with all of the same rights and privileges under Illinois law afforded to opposite-sex couples except the right to identify themselves as "married." See 750 ILCS 75/1, *et seq.* (2012).

Most recently, after months of legislative efforts by supporters of the change, the Illinois General Assembly passed, and Governor Quinn signed into law, Public Act 98–597 (Senate Bill 10), which permits same-sex couples to join in marriage. Pursuant to the effective-date provision of the Illinois Constitution, however, that law, which was passed after May 31, 2013, is not scheduled to take effect until June 1, 2014.

**Plaintiffs' Circumstances**

Plaintiffs, Vernita Gray and Patricia Ewert, are in a committed, long-term relationship and desire to be married. They have been together for over five years (Complaint, ¶ 19) and have outwardly expressed their commitment to each other by joining in a civil union, including both civil and religious ceremonies in 2011 (*Id.*, ¶ 23). Throughout this time, Plaintiffs have jointly battled Vernita's recurring breast cancer, which has since metastasized, resulting in numerous, serious surgeries. (*Id.*, ¶ 31.)

4

Today, Vernita is terminally ill with breast cancer and, based on her doctors' prognosis, may not live long past the filing of the Complaint. (*Id.*, ¶¶ 24-31.) Plaintiffs wish to marry to demonstrate the unique and deeply personal nature of their commitment to one another, as well as to ensure that Patricia will be officially recognized as Vernita's wife, able to make important health decisions on Vernita's behalf and to receive survivor benefits, including social security and estate tax benefits that are available only to persons who are officially married under state law.

## ARGUMENT

**I.    The Court Should Grant Interlocutory Injunctive Relief Permitting Plaintiffs to Be Married Before Vernita Gray's Imminent Death Makes that Impossible.**

**A.    Standards Governing TRO's and Preliminary Injunctions**

Temporary restraining orders and preliminary injunctions are reserved for circumstances in which the legal remedies available in a final judgment, at the end of the case, are inadequate to avoid an irreparable injury. See *Beacon Theatres v. Westover*, 359 U.S. 500, 506-07 (1959). As described below, those circumstances are present here.

"The standards for issuing [a temporary restraining order ("TRO")] are identical to the standards for preliminary injunctions." *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). The relevant difference focuses on their duration and the corresponding period during which relief is necessary to prevent irreparable injury: until the court can rule on a motion for a preliminary injunction, and until it can enter a final ruling on the ultimate merits of the claim. See *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999).

5

Issuance of a TRO or preliminary injunction requires the movant to establish (1) some likelihood of success on the merits of the underlying claim, (2) the absence of an adequate remedy at law, and (3) irreparable harm if the TRO or preliminary injunction is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313-14 (7th Cir. 1994); *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976); see also *Roland Mach. Co. v. Dresser Industries, Inc.*, 749 F.2d. 380, 386 (7th Cir. 1984) (noting that the focus of the irreparable harm inquiry for a preliminary injunction is the interim period until the case can be decided on the merits). If the moving party satisfies these criteria, the court will balance the potential hardships, weighing the harm to the moving party from being denied relief to which it may be entitled against the harm to the non-moving party from granting relief ultimately found not to be warranted, and will further consider the impact on the public interest. *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). This balancing process involves a "sliding scale" analysis that has the goal "to minimize the cost of potential error," *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008), and under which a greater risk of harm to the moving party from the denial of relief reduces the likelihood of success that must be shown to justify that relief, *Storck USA*, 14 F.3d at 313-14; see also *Roland Mach. Co.*, 749 F.2d. at 387. Where the potential injury is great, the corresponding likelihood-of-success threshold requires only that the movant's chances be "'better than negligible.'" *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1010 (7th Cir. 2010) (quoting *Roland Mach. Co.*, 749 F.2d at 386-87)).

B.  **Plaintiffs Have Established an Irreparable Injury and the Absence of an Adequate Remedy at Law.**

There can be no real dispute that Plaintiffs have satisfied the requirements of irreparable harm and no adequate remedy at law. Their claim will most likely be moot after May 31, 2014. Even the prospect of a judgment a few months from now is essentially illusory, for Vernita is nearing her final physical and mental decline (Complaint, ¶¶ 24-30), and once she dies, a court order directing defendant Orr to issue her a marriage license will be pointless.

Plaintiffs' injuries from being denied the right to marry at this time are also substantial. A violation of one's constitutional rights is, by its very nature, qualitatively different from other civil wrongs, such as a breach of contract, for which a legal remedy in the form of damages at the culmination of the suit typically provides complete relief. Cf. *Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 632 (4th Cir. 1960) (affirming preliminary injunction against policy requiring African-American passengers to use separate waiting room). In addition, the immeasurable, but intangible, benefits to Plaintiffs of having the official status of marriage are significant. Marriage is not just a technical legal arrangement, but instead embodies "a deeply personal commitment to another human being and a highly public celebration of the ideals of mutuality, companionship, intimacy, fidelity, and family." *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 954 (Mass. 2003); see also *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (recognizing that marriage is "fundamental to [a person's] very existence").

An official marriage pursuant to a state license issued by defendant Orr will also carry with it important federal rights and benefits, including under federal laws relating

7

to social security, as well as federal inheritance and tax laws. See *United States v. Windsor*, 133 S. Ct. 2675, 2692-96 (2013) (holding that federal laws based on marriage status must apply to same-sex "marriages" valid under state law). Without a state-law marriage certificate, Plaintiffs cannot ensure Patricia Ewert's ability to take medical leave to care for Vernita pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, or establish Ms. Ewert's right to receive survivor benefits, including spousal and estate tax benefits, when Vernita passes away. (Complaint, ¶¶ 40, 47.) Delay in obtaining a marriage certificate also prevents Plaintiffs from filing a joint income tax return.

### C. Plaintiffs Have Established a Likelihood of Success on the Merits.

The unique circumstances of this case warrant the conclusion that the Plaintiffs are likely to succeed on the merits of their claim that, as applied to them, the provisions of Illinois law presently in effect that deny them the right to be married based on their sexual orientation violate their constitutional right to equal protection. The Attorney General submits that laws that discriminate against gay and lesbian members of society are subject to heightened scrutiny, requiring that the classification be substantially related to an important governmental objective. See *Clark v. Jeter*, 486 U.S. 456, 461 (1988); see also *United States v. Virginia*, 518 U.S. 515, 533 (1996). Other courts have reached this conclusion. See *Pederson v. Off. of Personnel Mgmt.*, 881 F. Supp. 2d 294, 333 (D. Conn. 2012); *Golinski v. Off. of Personnel Mgmt.*, 824 F. Supp. 2d 968, 989-90 (N.D. Cal. 2012), *appeal dismissed*, 724 F.3d 1048 (9th Cir. 2013). There is no need for the Court to reach this issue in connection with Plaintiffs' motion, however, because, as

8

applied to them, the ban on same-sex marriage under present Illinois law does not even survive the more searching form of rational basis scrutiny set forth in a series of Supreme Court decisions.

Over the past two decades, the Supreme Court has invalidated multiple laws singling out gay and lesbian individuals for disfavored treatment. See *Windsor*, 133 S. Ct. at 2692-96 (Section 3 of Defense of Marriage Act ("DOMA")); *Lawrence v. Texas*, 539 U.S. 558 (2003) (criminal anti-sodomy law); *Romer v. Evans*, 517 U.S. 620 (1996) (state law prohibiting local ordinances banning discrimination against gays and lesbians). Without establishing a definitive standard of scrutiny for such laws, see *Windsor*, 133 S. Ct. at 2706 (Scalia, J., dissenting), the Court nonetheless has made clear that gays and lesbians are a "politically unpopular group," and that "a bare . . . desire to harm" them is not a "legitimate governmental interest" for purposes of rational basis scrutiny and, therefore, "cannot justify disparate treatment." *Windsor*, 133 S. Ct. at 2681 (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)); *Romer*, 517 U.S. at 634-35. For such laws, "mere negative attitudes, or fear" are insufficient to sustain them. *City of Cleburne*, 473 U.S. at 448-49; see also *Lawrence*, 539 U.S. at 582 (O'Connor, J., concurring) ("Moral disapproval of [homosexuals] . . . is insufficient to satisfy rational basis review under the Equal Protection Clause."); *Diaz v. Brewer*, 656 F.3d 1008, 1012 (9th Cir. 2011). That analysis is directly relevant here.

As described above (at 2-4), the history of Illinois marriage law establishes that the provisions prohibiting marriage between same-sex partners, and in particular the 1996 amendment declaring such marriages to be against public policy, were motivated

9

by an intention to single out gay and lesbian individuals for less favorable treatment based solely on their sexual orientation. As *Windsor*, *Lawrence* and *Romer* teach, that unmistakable aspect of these provisions of Illinois law is not a legitimate governmental interest and is sufficient to establish that they violate Plaintiffs' equal protection rights. *Windsor* is particularly relevant, for although it emphasized the States' historic role in defining marriage, it emphatically affirmed that a legislative desire to stigmatize same-sex couples by denying them equal status in the eyes of the law serves no constitutionally "legitimate purpose." 133 S. Ct. at 2693-96 (noting that DOMA had the purpose and effect to "demean" and to "disparage and to injure" same-sex couples, to brand them as "unworthy," to "impose inequality" and a "stigma" on them, to deny them "equal dignity," and to treat their unions as "second-class marriages").

The result would be the same even if the Court went further and examined hypothetical *post hoc* justifications for Illinois' ban on same-sex marriage. Even before the Illinois General Assembly passed Public Act 98–597 allowing same-sex marriage, Illinois law, which permitted civil unions, lacked any meaningful justification for reserving the designation "marriage" to opposite-sex couples, while giving all other state-law rights to same-sex couples joined in a civil union. That two-tier classification, in which the only meaningful difference is the inferior legal status — and corresponding lower social recognition — accorded to gay and lesbian partners, is not rationally related to any legitimate governmental objective. And to the extent a plausible argument could have been made that it was, that argument has lost all possible significance as applied to Plaintiffs where the supposed policy justification for it has now been unequivocally

10

disavowed by the Illinois legislature.

Any appeal to tradition for its own sake has no constitutional weight under an equal protection analysis relevant to discrimination against gay and lesbian members of society. See *Romer*, 517 U.S. at 635; *Lawrence*, 539 U.S. at 577-78. Nor do the other frequently-invoked justifications for limiting marriage to opposite-sex couples — including promoting "responsible" procreation and having children raised by both of their biological parents — validly support a classification system under which only the label "marriage" is denied to same-sex partners. The notion that denying that preferred status to same-sex couples will somehow encourage opposite-sex partners to decide to marry is dubious, at best, and, at worst, premised on the invidious premise that something as fundamental as marriage will be desirable for opposite-sex couples only if it is unattainable for otherwise qualified same-sex partners. That notion is further belied by the fact that opposite-sex marriages are not limited by law to couples who are able to conceive and bear children. And because same-sex partners under current Illinois law, which allows them to enter into civil unions, already have the same rights to bear, adopt and raise children, the only effect of denying them the right to marry is to stigmatize and demean their children by relegating their parents to an inferior status. See *Windsor*, 133 S. Ct. at 2695-96.

Whatever credit might previously have been given to the position that reserving the official designation of "marriage" to opposite-sex spouses rationally furthers a legitimate public goal, that position no longer has any meaningful significance for Plaintiffs in light of the Illinois General Assembly's recent enactment of Public Act

11

98–597, which has categorically disavowed any official policy of treating traditional marriages between opposite-sex partners as being in any way superior or preferable to same-sex marriages. For the unique situation presented by Plaintiffs, therefore, continuing to give effect to a policy that the Illinois legislature itself has repudiated does not rationally serve any legitimate purpose.

### D. The Balance of Hardships Favors Granting Interlocutory Injunctive Relief.

The above-described basis for granting Plaintiffs' motion is not overcome by a weighing of the equities or an examination of the balance of hardships related to the alternatives of granting and denying that motion. If, on the one hand, Plaintiffs' equal protection claim has merit, denying the interlocutory injunction they seek will in all likelihood prevent them from ever being able to marry and to obtain the benefits associated with doing so. In the circumstances presented here, the denial of temporary relief will, for all intents and purposes, be tantamount to definitively denying their claim.

If, on the other hand, a final determination of Plaintiffs' equal protection would establish that it does not have merit, the injury to defendant Orr and the State of Illinois would be comparatively minor. Given the enactment of Public Act 98–597, any such injury from an erroneous ruling permitting Plaintiffs to marry, effectively moving up for them by a few months Illinois' newly adopted policy allowing same-sex marriages, could not be considered significant.

### E. A TRO or Preliminary Injunction Permitting Plaintiffs to Be Married Before Vernita Dies Conforms to the Public Interest.

Finally, for similar reasons the public interest would not be materially prejudiced

12

by a TRO or preliminary injunction allowing Plaintiffs to be joined in marriage while Vernita's medical condition still gives Plaintiffs time to do so. The Illinois General Assembly has now declared an official policy of extending the institution of marriage to gay and lesbian citizens of the State. In the exceptional circumstances presented by this case, the public interest is advanced, not thwarted, by granting Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a TRO or preliminary injunction authorizing them to obtain a marriage license and to be married before Vernita's impending death.

November 25, 2013

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

　/s/ *Richard s. Huszagh*　
RICHARD S. HUSZAGH
Assistant Attorney General
Malini Rao                              100 West Randolph, 12th Floor
Christopher Kim                         Chicago, Illinois  60601
Assistant Attorneys General             (312) 814-2587
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-3000

13

## Certificate of Filing and Service

The undersigned, an attorney, hereby certifies that on November 25, 2013, he caused the foregoing <u>Illinois Attorney General's Memorandum in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction</u> to be filed electronically with the U.S. District Court for the Northern District of Illinois, with copies thereby automatically served electronically on all other counsel of record registered with the Court's CM/ECF system in this case, and also to be served by postage-prepaid first class mail in envelopes addressed to:

| | |
|---|---|
| Emily Nicklin, P.C.<br>Jordan M. Heinz<br>Jeremy Press<br>Mishan Wroe<br>KIRKLAND & ELLIS LLP<br>300 N. LaSalle St.<br>Chicago, IL  60654 | John A. Knight<br>Harvey Grossman<br>Karen Sheley<br>ROGER BALDWIN FOUNDATION<br>OF ACLU, INC.<br>180 N. Michigan Ave., Suite 2300<br>Chicago, IL  60601 |
| Camilla B. Taylor<br>Christopher R. Clark<br>LAMBDA LEGAL DEFENSE AND<br>EDUCATION FUND, INC.<br>Midwest Regional Office<br>105 W. Adams St., Suite 2600<br>Chicago, IL  60603 | Marc O. Beem<br>Zachary J. Freeman<br>M. David Weisman<br>Kay L. Dawson<br>MILLER SHAKMAN & BEEM LLP<br>180 N. LaSalle St., Suite 3600<br>Chicago, IL  60601 |

David Orr, Cook County Clerk
c/o Anita Alvarez
State's Attorney
Patrick T. Driscoll, Jr.
Assistant State's Attorneys
500 Richard J. Daley Center
50 W. Washington St.
Chicago, IL  60602

                                                                   /s/ *Richard Huszagh*
                                                                  Richard S. Huszagh